**GAUNTLETT & ASSOCIATES**
David A. Gauntlett (SBN 96399)
James A. Lowe (SBN 215383)
18400 Von Karman, Suite 300
Irvine, California  92612
Telephone:  (949) 553-1010
Facsimile:  (949) 553-2050
info@gauntlettlaw.com
jal@gauntlettlaw.com

Attorneys for Plaintiff
VOGUE INTERNATIONAL, LLC
d/b/a VOGUE INTERNATIONAL

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| VOGUE INTERNATIONAL, LLC d/b/a VOGUE INTERNATIONAL, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>HARTFORD CASUALTY INSURANCE COMPANY, an Indiana corporation<br><br>Defendant. | Case No.:<br><br>**COMPLAINT**<br><br>(Declaratory Relief – 28 U.S.C. § 2201) |

In this insurance coverage case Plaintiff Vogue International, LLC d/b/a Vogue International (hereinafter "Vogue") sues for a declaratory judgment that: (1) its general liability insurer, Defendant Hartford Casualty Insurance Company (hereinafter "Hartford"), had a duty to defend Vogue in the underlying litigation styled as *Andrea Golloher, Marisa Freeman, Roberta Chase, James Hanks, Michael Shapiro, Brenda Brown, Gretchen Swenson, Crystal Kenny, Kelly Bottari, Renee Conover, and Shanisha Sanders, et al. v. Todd Christopher International, Inc. d/b/a Vogue International*, Case No. 3:12-cv-06002-RS, United States District Court for the Northern District of California (the "*Golloher suit*"); and (2) Hartford must reimburse Vogue for all the defense expenses it incurred in that action, plus prejudgment interest at the applicable legal rate from the date of invoice.

## THE PARTIES

1. Plaintiff Vogue International, LLC d/b/a Vogue International is a limited liability company organized under the laws of the State of Delaware. Its principal executive offices and place of business are located in Pinellas County, Florida. Vogue was previously known as Todd Christopher International, Inc. d/b/a Vogue International, and Todd Christopher International, LLC d/b/a Vogue International, both of which were registered in the State of Florida.

2. On information and belief, Defendant Hartford is an Indiana corporation with its principal place of business in Hartford County, Connecticut.

## JURISDICTION

3. This is an action for declaratory relief pursuant to 28 U.S.C. § 2201. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Vogue and Hartford, and there is more than $75,000 in controversy.

## VENUE AND CHOICE OF LAW

4. Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(a)(c) in that the underlying action for which Vogue seeks defense, the *Golloher suit*, was originally filed in Alameda County and removed to this District.

5. On information and belief, Hartford sells insurance and defends lawsuits in California, including in this District.

6. This federal judicial district is the place of performance under the Policy and California law governs Hartford's obligations to Vogue.

## THE HARTFORD POLICY

7. Hartford issued to Vogue a succession of primary commercial general liability policies (№ 21 UUN UV6168) starting on September 11, 2003 and then renewed annually until cancellation on March 1, 2009. The same policy forms were used from September 11, 2005 through March 1, 2009 (the "Policy"). A copy of the September 11, 2008 – March 1, 2009 Policy is attached as **Exhibit "1."**

8. Hartford also issued to Vogue umbrella liability policies, but those are not the subject of this Complaint.

9. The primary commercial general liability Policy provides coverage for "personal and advertising injury" arising out of an offense committed during the policy period, and defense of suits seeking damages because of "personal and advertising injury."

10. Pertinent language from the Policy's main "Commercial General Liability Coverage Form," form HG 00 01 06 05, includes:

> **COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**
>
> **1.    Insuring Agreement**
>
> **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages …
>
> **SECTION IV - DEFINITIONS**
>
> **1.**    "Advertisement" means the widespread public dissemination of information or images that has the purpose of inducing the sale of goods, products or services through:
> …
>
> **b.**    Any other publication that is given widespread public distribution.
> …
>
> **2.**    "Advertising idea" means any idea for an "advertisement."
> …
>
> **17.**    "Personal and advertising injury" means injury . . . arising out of one or more of the following offenses:
> …
>
> **d.**    Oral, written or electronic publication of material that … disparages a person's … goods, products or services.
> …
>
> **f.**    Copying in your "advertisement," a person's or organization's "advertising idea" or style of "advertisement";
> …

**[Exhibit "1" (Form HG 00 01 06 05 pp. 5, 15, 17)]**

11. Pertinent language from the Policy's "Cyberflex Amendment of Coverage B – Personal and Advertising Injury Liability," form HC 00 88 06 05, includes:

> **CYBERFLEX AMENDMENT OF COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**
> …

This endorsement broadens coverage under HG 00 01 for your web site or internet related activities.

    **A.**    **Section V - Definitions** is changed as follows:

    **1.**    **Definition Of Advertisement - Internet**

The following is added to Paragraph a. of the definition of "advertisement":

"Advertisement" means the widespread public dissemination of information or images that has the purpose of inducing the sale of goods, products or services through:

    **a.**    **(6)**  The Internet;

    **2.**    **Definition of Personal And Advertising Injury**

    **a.**    **Your Web Site**

Paragraphs **f.** and **g.** of the definition of "personal and advertising injury" are replaced by the following:
…

    **f.**    Copying, in your "advertisement" or on "your web site", a person's or organization's "advertising idea" or style of "advertisement";
…
    **g.**    Infringement . . . of slogan . . . in your "advertisement";

    **3.**    **Definition of "Your Web Site"**

The following definition is added:

"Your web site" means a web page or set of interconnected web pages prepared and maintained by you, or by others on your behalf, that is accessible over an internet.
… **[Exhibit "1" (Form HC 00 88 06 05 p. 1]**

## THE UNDERLYING *GOLLOHER* SUIT

12. On October 25, 2012, a class-action lawsuit was filed against Vogue alleging that, from 2010 through 2012, plaintiffs were induced to purchase Vogue's "Organix" products by Vogue's marketing of these products as containing all or mostly "organic" ingredients. A copy of the initial complaint in the *Golloher suit* is attached as **Exhibit "2."**

13. On August 9, 2013, plaintiffs filed a First Amended Complaint against Vogue. A copy of the First Amended Complaint is attached as **Exhibit "3."** This was plaintiff's only amendment of the complaint and the operative complaint when the *Golloher* suit settled.

14. The First Amended Complaint includes the following allegations:

1. This First Amended Complaint seeks to remedy the unlawful, unfair, and deceptive business practices of defendant Todd Christopher International, Inc. dba Vogue International ("Defendant" or "Vogue") with respect to its cosmetic products (also referred to as personal care products) sold under the Organix brand name (the "Products"). **The Products are advertised,** marketed, labeled, sold, and represented **as organic**, but are composed almost entirely from ingredients that are not organic. All of **the Organix Products are prominently marketed and labeled as "Organix," a name which was chosen to look and sound like the word "organics" in order to represent that the Products are organic**. In addition, Defendant's marketing materials for the Organix Products are littered with statements that represent the Products as organic, and the front and back labels of some of the Products state that the Products contain organic ingredients. Plaintiffs and the Class reasonably believed Defendant's representations that the Products are organic. **But-for Defendant's false and misleading identification of the Products as organic the Plaintiffs and the Class would not have purchased the Products or paid such a high price for the Products** instead of purchasing truly organic products available from Defendant's competitors.

2. Plaintiffs have, all along, perceived a need for resolution of the claims set forth in the original complaint on a nationwide basis. Since the filing of the original Complaint, facts evidencing liability have come to light that warrant this amendment. Joinder of additional states in this amendment is based on the same core counts and legal theories as were set forth in the original Complaint.

. . . .

4. **Defendant's conduct of advertising**, marketing, selling, labeling, and **representing the Products as organic**, when in fact such Products are composed mainly of non-organic ingredients, constitutes unlawful, **unfair, and deceptive conduct** . . . and **harms the organic industry**. As such, Defendant's marketing . . . and advertising practices violate the consumer protection, unfair trade practices, and/or deceptive acts laws of all 50 states and the District of Columbia.

5. California law expressly prohibits companies such as Defendant from engaging in this type of misleading labeling. . . . The Products are cosmetics that contain far less than 70% organically produced ingredients, excluding water and salt. Nevertheless, **Defendant** labels, sells, and **represents the products as organic.**

6. Use of the Organix label calls into question other similar representations of products as organic, thereby denigrating the reputation of and eroding confidence in organic personal care products that comply with COPA as well as other regulatory provisions nationally.

. . . .

25. **In 2006, Defendants introduced their "Organix" line of Products.** Although the Products contain very small quantities of organic ingredients, Defendants selected a brand name that looks nearly identical

to, and sounds identical to, the word "organics," in order to exploit the growing consumer demand for organic products. To ensure that consumers made the association between "Organix" and "organics," Defendants also emblazoned the word 'organic' on the front label of the Products in bold type and littered their advertising materials with references to the Products' allegedly organic properties. Nevertheless, the Products are largely composed of ingredients which Defendants admit are not organic.

26. Defendants' scheme to exploit consumer demand for organic products by **falsely advertising the Products as organic** has been extraordinarily successful . . .
. . . .

28. . . . Although Vogue changed the description of its goods to secure USPTO approval of the trademark, Defendants did not change the formulation of the Products. In fact, the products all contain less than 10 percent organic ingredients – in most instances, far less.

29. **Defendants advertise**, market, label, sell, and represent **the products as organic** . . .

30. . . . the **Products from** each promotional cycle **always contain the word "Organix"** emblazoned on the front of the packaging in the same location, coloring, and font.
. . . .

32. . . . In addition to concerns regarding the effect of non-organic chemicals on their own bodies, many consumers who embrace the "organic lifestyle" pursue such a lifestyle by purchasing organic products. By misleading consumers about its Products, Defendant undermines those efforts, misleading consumers to buy Defendant's non-organic products in lieu of truly organic ones.

33. **Each year, Defendant has issued new and updated "Organix'-themed advertising in print and on its website, blog, Facebook page and Twitter account, as well as in other promotions and promotional tie-ins.** For example, in addition to noting the organic attributes of Defendant's products, such **"Organix"-themed advertising has, at different times, focused on Vogue's "green packaging," the environment, natural elements of the products, and the planet,** all of which Defendant used to retain customer interest as well as attract new customers.
. . . .

36. . . . **In reliance on Defendants' claims that the Products are organic, Plaintiffs were willing to pay more for the Products than similar products that do not claim to be organic**, and in fact did pay a premium for the Products. . . .
. . . .

50. . . . Each of the aforementioned laws prohibits **unfair and deceptive acts or practices** in the conduct of trade or commerce within that jurisdiction. The referenced conduct includes that which directly and **indirectly** injures the Plaintiffs and Class members, by:
    a. Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of Defendant or Defendant's products;
    b. **Causing confusion or misunderstanding as to Defendant's or Defendant's Products' affiliation, connection, or association with, or certification by another**; …

    . . . .
    f.    **Disparaging the goods, products, or business of another** by false or misleading representation of fact; . . .

    51.    Defendants have engaged and continue to engage in conduct that is likely to deceive members of the public . . . This conduct includes, but is not limited to, **misrepresenting that the Products are organic when, in fact, the Products are not composed predominantly of organic ingredients.**

    52.    Plaintiffs purchased the Products after reviewing the front of the label of such Product based on Defendants' representations that the Products are organic. Plaintiffs would not have purchased the Products at all, or would not have paid such a high price for the Products, but for Defendants' false promotion of the Products as organic. Plaintiffs have thus suffered damages. **[Exhibit "3" ¶¶1, 2, 4, 5, 6, 25, 26, 28, 29, 30, 32, 33, 36, 50, 51, 52] (emphasis added)**

## **VOGUE'S NOTICE TO HARTFORD AND ITS DENIAL OF COVERAGE**

15.    On November 21, 2012, Deborah Quiles, Vogue's insurance broker and an agent of Hartford, was notified of the underlying *Golloher suit* against Vogue. A copy of that communication is attached as **Exhibit "4."**

16.    In a letter dated December 14, 2012, Hartford denied that even potential coverage arose for the *Golloher suit*. A copy of that letter is attached as **Exhibit "5."**

17.    On August 12, 2013, Hartford was notified of the First Amended Complaint in the underlying *Golloher suit* against Vogue. A copy of that communication is attached as **Exhibit "6."**

18.    In a letter dated September 24, 2013, Hartford, after receiving the amended complaint, again denied that even potential coverage arose for the *Golloher* suit. A copy of that letter is attached as **Exhibit "7."**

19.    In the September 24, 2013 letter, Hartford stated:

    As stated in our correspondence dated December 14, 2012, there is no claim asserted that comes within the scope of coverage provided by the primary and umbrella general liability policies in effect September 11, 2008 to March 1, 2009, as there is no claim for damages arising out of a "personal and advertising injury," as that term is defined in the primary policy. Claims for false advertising do not constitute a covered offense. Further, even if the allegations contained in the First Amended Complaint asserted a potential "personal and advertising injury", which is denied, the policy contains exclusions including, without limitation, exclusion 2.g., titled Quality of Performance Of Goods – Failure to Conform to Statements, the excludes coverage for injury "arising out of the failure of goods, products or services to perform with any quality or performance made in your 'advertisement'", as well as exclusion 2.b which bars

coverage for material published by or at the direction of the insured with knowledge of its falsity. Accordingly, Hartford has no contractual duty to defend Vogue and will take no further action in connection with the instant litigation. **[Exhibit "7"]**

20. To this date, Hartford has steadfastly failed and refused to fully investigate and defend Vogue in the *Golloher suit*. Because Hartford has failed and refused to defend Vogue in the *Golloher suit*, Vogue has been forced to retain and pay defense counsel.

21. Vogue has denied and defended against the allegations in the underlying complaints referenced herein and strongly contests the substantive underlying allegations. Vogue expressly denies the allegations against it in the underlying *Golloher suit*. Yet the *Golloher suit* alleged activity on the part of Vogue which created a potential for coverage under the Policy's "personal and advertising injury" coverage, especially when considered in conjunction with the inferences that can be drawn from those allegations and the potential for amendment of the underlying pleadings. Hartford's duty to defend extends to false, frivolous, or groundless suits, as Vogue believes the underlying suit to be.

22. Vogue does not, by this Complaint or by reference to underlying allegations or inferences drawn from them, or observations about the potential for amendment, admit the truth of any of the underlying allegations. Vogue's alleged underlying conduct, as well as the inferences drawn therefrom and the potential allegations that could be made upon amendment, are discussed only to demonstrate that they created a potential for insurance coverage by Hartford.

23. Vogue's allegations in this coverage complaint explaining Hartford's duty to defend are based, not on true facts, but on the underlying allegations and inferences arising from those allegations as showing a potential for coverage, thereby triggering Hartford's duty to defend. Therefore, Vogue does not admit the truth of any underlying allegations but explains here how the underlying allegations under the language of Hartford's policies trigger Hartford's duty to defend Vogue.

**SETTLEMENT OF THE UNDERLYING ACTION**

24. On April 25, 2014, a Final Approval Order was entered in the underlying *Golloher suit* approving dismissal upon stipulation by the parties after settlement. That settlement is currently being appealed.

25.     The attorneys' fees include fees incurred from the time of notice to Hartford on November 21, 2012 through the date of settlement with prejudgment interest recoverable from the date of invoice at ten percent (10%) per annum.  The nature of the duty to defend includes not only the defense obligation, but the appellate costs being incurred as well.  Plaintiff is also entitled to any and all settlement monies deemed payable at such time as the settlement is confirmed.

**ALLEGATIONS OF EXPLICIT AS WELL AS IMPLICIT DISPARAGEMENT ESTABLISH A POTENTIAL FOR COVERAGE UNDER OFFENSE (d)**

**A Three-Element Test Applies to This Offense**

26.     The Policy defines "Personal and advertising injury" as having three elements relevant here: (1) "injury … arising out of"; (2) "oral, written or electronic publication of material"; (3) "that disparages a person's or organization's goods, products or services."

27.     Each of the three elements described in the preceding paragraph is potentially met by the allegations of the *Golloher suit*, thereby triggering Hartford's duty to defend Vogue.

28.     The allegations about Vogue's conduct are sufficient to establish a potential for coverage under the Policy's "Personal and Advertising Injury" offense (d) – "Oral, written or electronic publication of material that … disparages a person's or organization's goods, products or services," thus triggering Hartford's duty to defend under the Policy.

**Element One Is Met: "Injury Arising Out Of" Offense (d)**

29.     The Hartford Policy defines "personal and advertising injury" as any "injury … arising out of" a listed *offense*.

30.     "Arising out of," as used in the definition of "personal and advertising injury," is undefined in the Policy and is a term of much broader significance than "caused by." The term "arising out of" means "originating from," "having its origin in," "growing out of," "flowing from," "incident to," or "having connection with."

31.     "Arising out of," as used in the definition of "personal and advertising injury," does not require "proximate causation."

32.     The *Golloher suit* complaints allege Vogue's conduct "… directly and indirectly injures the [claimants] by: … (f) Disparaging the goods, products, or business of another by false or

misleading representation of fact." **[Exhibit "2" ¶50]** The claimants also allege: "Plaintiffs would not have purchased the Products at all, or would not have paid such a high price for the Products, but for Defendants' false promotion of the Products as organic. Plaintiffs have thus suffered damages." **[Exhibit "2" ¶52]**

33. The "injury arising out of" element is met in the *Golloher suit* complaints by the claimants' allegations that the "injury" they sustained "originated from," was "incident to" or "had a connection with" Vogue's disparagement of competing products and producers.

34. Therefore the injury alleged in the underlying case potentially "arises out of" offense (d).

### Element Two Is Met: "Oral, Written or Electronic Publication of Material"

35. The First Amended Complaint alleges:

> 25. [Vogue] . . . littered their advertising materials with references to the Products' allegedly organic properties . . .
>
> . . . .
>
> 33. **Each year, Defendant has issued new and updated "Organix"-themed advertising in print and on its website**, blog, Facebook page and Twitter account, as well as in other promotions and promotional tie-ins. For example, in addition to noting the organic attributes of Defendant's products, such "Organix"-themed advertising has, at different times, focused on Vogue's "green packaging," . . .which Defendant used to retain consumer interest as well as attract new customers. **[Exhibit "2" ¶¶25, 33] (emphasis added)**

36. From these allegations it is reasonable to infer that Vogue was publishing statements that were disparaging to its competitors to consumers and the public-at-large.

37. Unlike the offense for "copying, in your 'advertisement,' a person's advertising idea," the Policy's disparagement offense does not require an "advertisement."

38. The undefined term "publication" requires only one recipient other than the one being disparaged.

39. Nevertheless, the widespread publication of disparaging materials in retail locations, in "advertising materials," and on Vogue's website, blog, Facebook page, and Twitter account is expressly alleged in the allegations of the *Golloher suit* complaints.

40. Falsity of the disparaging material is not a requirement of the Policy.

41. Nevertheless, falsity of the disparaging material is alleged in the *Golloher suit*, e.g.,

1 "falsely advertising the Products as organic."

**Element Three Is Met: "Disparages a Person's or Organization's Goods, Products, or Services"**

42. Hartford provides coverage for "damages because of … injury arising out of … oral, written or electronic publication of material that … **disparages** a person's or organization's goods, products or services."

43. The *Golloher suit* complaints allege Vogue's conduct "… directly and indirectly injures the [claimants] by: … **(f) Disparaging** the goods, **products**, or business **of another** by false or **misleading representation of fact**." **[Exhibit "2" ¶50]** (emphasis added)

44. The claimants allegations imply that Vogue's use of the term "organic" to market, advertise, and sell its product despite not containing primarily organic ingredients and thus misleading consumers harmed the organic industry and Vogue's competitors by calling into question the use of the term "organic" by competitors whose products comply with applicable regulations and by making an invidious comparison to its competitors, suggesting that Vogue's product is priced more competitively than its other truly organic counterparts.

45. The facts alleged in the *Golloher suit* complaints fall within the ambit of the "disparagement" policy offense.

46. The alleged promotion of Vogue's products as organic constitutes disparagement of the organic industry and Vogue's competitors who make organic products.

47. To the extent there is any *factual* dispute about what occurred that would evidence disparagement, that possibility alone triggers a duty to defend.

**FALSE ADVERTISING CLAIMS INCLUDE "COPYING A[N] ORGANIZATION'S ADVERTISING IDEA IN YOUR 'ADVERTISEMENT'" UNDER OFFENSE (f)**

48. The Policy defines "Personal and advertising injury" as containing four elements relevant here: (1) "injury … arising out of"; (2) "copying a person's or organization's"; (3) "'advertising idea' or style of 'advertisement'"; and (4) "in your 'advertisement' or on 'your web site'."

49. Each element is potentially met by the allegations of the *Golloher suit*, thereby

triggering Hartford's duty to defend Vogue.

**Element One Is Met: "Injury Arising Out Of" Offense (f)**

50. The Policy defines "personal and advertising injury" as any "injury" … "arising out of" a listed *offense*.

51. "Arising out of" as used in the definition of "personal and advertising injury," is undefined in the Policy and is a term of much broader significance than "caused by." The term "arising out of" means "originating from," "having its origin in," "growing out of," or "flowing from," or, in short, incident to, or having a connection with.

52. "Arising out of," as used in the definition of "personal and advertising injury," does not require "proximate causation."

53. The *Golloher suit* complaints allege Vogue's copying of the "organic" advertising idea, which is an idea with "the purpose of inducing the sale of goods, products or services."

54. The "injury arising out of" element is met in the *Golloher suit* complaints by the claimant's allegations that the "injury" they sustained (overpayment for false advertising of non-organic products) "originated from," was "incident to," or "had a connection with" Vogue's copying the "organic" advertising idea or style of advertisement in Vogue's "advertisement."

**Element Two Is Met: "Copying a Person's or Organization's" Is Alleged**

55. All the Policy requires for element two of offense (f) is that the advertising idea be "a person's or organization's" without specifying that the advertising idea belong to anyone in particular. The Policy language does not require a narrow construction that would require the idea to be owned by the party suing the insured.

56. The "copy of a person's" phrase is satisfied whenever an advertising idea is copied and was not originated by the insured—even if that is not that of the claimant. Otherwise, the policy language would be "copying [the claimant's] 'advertising idea'" as opposed to "a person's or organization's 'advertising idea.'"

57. "Of a person's or organization's" can mean "connected to or associated with a person or organization other than the insured" with no limiting definitional requirements that the idea be "connected" or "associated" with a claimant. This construction for "of a person's or organization's"

1  is reasonable, and if any reasonable construction of policy language supports coverage, it must be
2  applied even if another reasonable construction is possible.

3      58.    From the underlying complaint's allegations, there is a possibility that the "organic"
4  "advertising idea" was that "of a person or organization" and thus the potential for coverage exists.

5      59.    That the *Golloher suit* alleges "copying" can be inferred from its allegations of
6  "misleading advertising practices," and "confusion."

7      60.    The *Golloher suit* satisfies the "copying a person's or organization's element."

8  **Element Three Is Met: "'Advertising Idea' or Style of 'Advertisement'" Is Alleged**

9      61.    The Policy defines "advertising idea" as "any idea for an 'advertisement.'"

10     62.    "Advertising idea" thus means "any idea for information or images that has the
11 purpose of inducing the sale of goods, products or services through radio, television, billboard,
12 magazine, newspaper, the Internet, or any other publication that is given widespread distribution—
13 except, it does not include any idea for the design, printed material, information or images contained
14 in, on or upon the packaging or labeling of any goods or products, or an interactive conversation
15 between or among persons through a computer network."

16     63.    The complaint alleges that Vogue "selected a brand name that looks nearly identical
17 to, and sounds identical to, the word "organics," in order to exploit the growing consumer demand
18 for organic products." **[Exhibit "2" ¶ 25]**

19     64.    The complaint also alleges:

> 33.    Each year, **Defendant has issued new and updated "Organix'-themed advertising in print and on its website, blog, Facebook page and Twitter account, as well as in other promotions and promotional tie-ins.** For example, in addition to noting the organic attributes of Defendant's products, such "Organix"-themed advertising has, at different times, focused on Vogue's "green packaging," the environment, natural elements of the products, and the planet, all of which Defendant used to retain customer interest as well as attract new customers. **[Exhibit "2" ¶33]**

25     65.    It can be inferred from those allegations that "organic" is an advertising idea, and that
26 the claimants consider "organic" an advertising idea, given the assertion that Vogue intentionally
27 selected the name "Organix" and used the word "organics" in its advertising materials "in order to
28 exploit the growing consumer demand for organic products."

66. The principal reason for the use of "organic," then, on the Internet and in other inferred advertisements, is to encourage sales of Vogue's products.

67. The *Golloher suit* satisfies the "'advertising idea' or style of 'advertisement'" element.

**Element Four Is Met: "In Your 'Advertisement' or on 'Your Web Site'"**

68. Because the element of "'advertising idea' or style of 'advertisement'" incorporates the "advertisement" definition, the allegations quoted above referencing Vogue's "advertising in print and on its website" also satisfy this element.

69. The *Golloher suit* thus satisfies the "in your 'advertisement' or on 'your web site'" element.

## COUNT I

### Declaratory Relief – Duty to Defend

70. Vogue incorporates the allegations in the above paragraphs of this Complaint as though fully alleged herein.

71. Valid contracts existed between Vogue and Hartford, namely the Policy.

72. Vogue fully performed all of the obligations and conditions to be performed by it under the Policy, or has been excused from performing them as a result of Hartford's breach of its duty to defend.

73. By selling the Policy, Hartford agreed to provide a defense for suits seeking damages for "personal and advertising injury" offenses as defined in the Policy.

74. Vogue contends that the underlying *Golloher suit* complaints allege facts implicating the "personal and advertising injury" coverage under the Policy, thereby triggering Hartford's obligation to defend Vogue.

75. Vogue is informed and believes that Hartford disputes the foregoing contentions.

76. Hartford has denied and continues to deny that the *Golloher suit* complaints allege facts implicating coverage under the Policy, or state claims even potentially covered under the Policy, and has refused to defend Vogue in the *Golloher suit*.

77. An actual bona fide controversy exists between Vogue and Hartford that requires

judicial declaration by this Court of: (1) the parties' rights and duties under the Policy; (2) Hartford's duty to defend Vogue in the underlying *Golloher suit*; and (3) the amount of defense expenses owed by Hartford.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Vogue prays for judgment against Defendant Hartford as follows:

1. A judicial declaration that Hartford had a duty to defend Vogue in the underlying *Golloher suit* under the Policy;

2. A determination and award of general damages consisting of all reasonable defense expenses and settlement expenses incurred by Vogue in defense of the underlying *Golloher suit*;

3. Award of pre-judgment interest accruing from the date of each defense invoice or any settlement payment deemed payable at such time as the settlement is confirmed, at the statutory interest rate of 10% per annum;

4. Award of costs of suit herein;

5. Award of all reasonable sums incurred to settle the *Golloher suit* deemed payable at such time as the settlement is confirmed;

6. Such other and further relief as this Court may deem just and proper.

Dated: September 10, 2014

GAUNTLETT & ASSOCIATES

By: _____
David A. Gauntlett
James A. Lowe

Attorneys for Plaintiff VOGUE INTERNATIONAL, LLC d/b/a VOGUE INTERNATIONAL

# EXHIBITS TO COMPLAINT

**EXHIBIT 1** -   September 11, 2008 – March 1, 2009 Hartford Policy No. 21 UUN UV6168

**EXHIBIT 2** -   Initial *Golloher* Complaint filed October 25, 2012

**EXHIBIT 3** -   First Amended *Golloher* Complaint filed August 9, 2013

**EXHIBIT 4** -   November 21, 2012 e-mail to Hartford's agent with notification of the underlying *Golloher* suit

**EXHIBIT 5** -   Hartford's denial letter dated December 14, 2012

**EXHIBIT 6** -   August 12, 2013 e-mail to Hartford's agent with notification of the First Amended Complaint in the underlying *Golloher* suit

**EXHIBIT 7** -   Hartford's second denial letter dated September 24, 2013